UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RALPH NATALE, *et al.*,
                       Plaintiffs,

-v-

ALLIED AVIATION SERVICES, INC. *et al.*,
                       Defendants.

23-CV-7260 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Health Fund 917 is an employee welfare benefit plan. The Fund, along with its trustees, brings this action for breach of a Memorandum of Agreement against Defendants Allied New York, Inc. and Allied Aviation Services, Inc., as well as three employees of those companies, under Section 515 of the Employment Retirement Income Security Act. Before the Court is Defendants Allied New York's and Allied Aviation Services' motion to dismiss the First Amended Complaint. For the reasons that follow, the motion to dismiss is denied.

I.  Background

    A.    Factual Background

The following facts, taken from the First Amended Complaint, are assumed true for the purposes of this opinion. *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013). Defendants Allied New York Services, Inc. ("Allied New York") and Allied Aviation Services, Inc. ("Allied Aviation") (together, "Allied Defendants") are affiliated New York corporations that employ members of the Coal, Gasoline & Fuel Oil Teamsters, Chauffeurs, Oil Burner Installation, Maintenance, Servicemen, and Helpers of New York City and Vicinity, Nassau and Suffolk Counties, New York, Local Union No. 553 (the "Union"). (ECF No. 18 ("FAC") ¶¶ 9-14.) From 2014 to 2017, Allied New York and the Union were parties to a Collective

1

Bargaining Agreement ("CBA") that provided for an Allied Aviation Medical Plan for employees, as well as a method for opting out of that plan. (FAC ¶ 14; CBA at 20-21.) In 2017, the Union and Allied New York entered into a Memorandum of Agreement ("MOA") that amended and extended the CBA through 2022. (FAC ¶ 15.) Among other changes, the MOA provided that all full-time employees would no longer be covered by the Allied Aviation Medical Plan, but instead by the Health Fund 917 Medical Plan. (*Id.* ¶ 16.) In accordance with the change in plan, the MOA required Allied New York to "make monthly contributions for the Union employees participating in Health Fund 917." (*Id.* ¶ 17.) Employees were also required to make personal contributions to the new Health Fund 917, "as they had to the Allied Aviation Medical Plan." (*Id.* ¶ 18.) On June 9, 2017, the Health Fund 917 Manager received a list of employees participating in the new plan and enrolled them. (*Id.* ¶¶ 20-21.)

This dispute arose on July 12, 2017, when "the Union Secretary-Treasurer expressed concern that participating employees' contributions were not being deducted from their pay . . . ." (*Id.* ¶ 23.) Five years later, in July 2022, the Fund audited Allied New York's contributions, determining that it "underpaid the Fund $182,392.20 in employer contributions" during the period of July 1, 2017, to December 31, 2019. (*Id.* ¶¶ 27-29.) Adding $64,909.05 in interest as calculated by the Fund, the total alleged underpayment came to $247,301.25, which the Fund's auditor—Calibre CPA Group ("Calibre")—communicated to Defendants. (*Id.* ¶ 32.) The Fund later reduced its estimate of the outstanding total to $131,280.29 (comprising $97,563 in unpaid contributions and $33,716.69 in interest) and demanded the Allied Defendants pay within thirty days. (*Id.* ¶¶ 33-34.)

On July 20, 2022, Daniel LaBorde, Director of HR, Payroll & Benefits for Allied Aviation and Allied New York, responded to Calibre indicating Allied Aviation's disagreement

with the audit findings, stating, "If an employee does not return the enrollment form or the Opt Out payment form, we assume they do not want any coverage or benefits provided by the Health Fund 917 or Allied Aviation." (*Id.* ¶¶ 35-36.) On August 10, 2022, the Fund Manager responded, citing the language in the MOA that "[a]ll full-time employees . . . shall be covered by the Health Fund 917 Medical Plan . . . ," and also that the CBA required proof of alternative coverage in order to opt out—a requirement not abrogated by the MOA. (*Id.* ¶¶ 37-38.) Over the next several months, the Fund Manager and LaBorde exchanged further communications disagreeing about Defendants' obligations under the MOA. (*Id.* ¶¶ 39-54.) The Allied Defendants did not pay the requested amount. (*Id.* ¶¶ 57-58.)

### B.     Procedural Background

On August 16, 2023, Plaintiffs sued Allied Aviation—along with three of its directors—to enforce the MOA and for damages. (ECF No. 1.) Allied Aviation moved to dismiss the complaint on September 28, 2023. (ECF No. 13.) Plaintiffs then amended their complaint on November 6, 2023, adding Allied New York as an additional defendant. (FAC.)[1] The Allied Defendants then filed a second motion to dismiss on January 19, 2024. (ECF No. 25 ("SMTD").) Plaintiffs opposed the motion in a memorandum filed April 15, 2024. (ECF No. 36 ("Mem. Opp.").) The Allied Defendants filed a reply memorandum on April 24, 2024. (ECF No. 38 ("Reply").)

## II.     Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

---

[1] Defendants do not argue that the amendment adding Allied New York was untimely. Therefore, the First Amended Complaint "relates back" to the filing of the original complaint on August 16, 2023. *See* Fed. R. Civ. P. 15(c)(1)(B)-(C).

570 (2007). A complaint need not contain "detailed factual allegations," but it must offer something "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 555). In resolving a motion to dismiss, the Court must accept as true all well-pleaded factual allegations in the complaint, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

### III. Discussion

Plaintiffs assert a claim under Section 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1145, which provides that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall . . . make such contributions in accordance with the terms and conditions of such plan or such agreement." Section 502(a)(3) of ERISA permits a "participant, beneficiary, or fiduciary" of such a plan to initiate a civil action to enjoin an act or practice in violation of Section 515 and to obtain other appropriate equitable relief. 29 U.S.C. § 1132(a)(3). This Court has jurisdiction under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). The Allied Defendants raise three bases for dismissing the complaint pursuant to Rule 12(b)(6).

#### A. Obligation Under the MOA

The Allied Defendants' first basis for dismissing the First Amended Complaint is that they had no written obligation to remit contributions for employees listed in the audit who did not affirmatively indicate their participation in the Health Fund 917 plan or authorize Defendants to deduct the employee portion of the contribution from the employees' paychecks. Plaintiffs do

4

not dispute that a written agreement requiring contributions is a prerequisite to their claim. They argue, instead, that the language of the MOA requires Allied to contribute to the Health Fund 917 plan for all employees, regardless of whether they affirmatively indicated their participation in the plan or authorized accordant payroll deductions. (*See* Mem. Opp. at 8.) The first issue thus turns on the proper interpretation of the MOA's description of Allied's contribution requirements—namely, whether they applied to all employees, or whether they applied to only those employees who affirmatively indicated their participation. The relevant text provides:

> Article 16.2: Medical Plans
> a. All full-time employees shall no longer be covered by the Allied Aviation Medical Plan and shall be covered by the Health Fund 917 Medical Plan effective July 1, 2017.
> b. Allied will contribute the following monthly amounts for each of its employees participating in the Health Fund 917 Plan, effective July 1, 2017: [amounts for single and family plans].

(MOA at 2.) Plaintiffs emphasize section (a), which speaks of "[a]ll full-time employees." (*See* Mem. Opp. at 8.) The Allied Defendants emphasize section (b), which speaks of "employees participating in the Health Fund 917 Plan." (*See* SMTD at 4.)

"At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." *Orchard Hill Master Fund Ltd. v. SBA Comms. Corp.*, 830 F.3d 152, 156 (2d Cir. 2016) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004). Where the case turns on an ambiguity, dismissal at this stage is improper, since the "court has insufficient data to dismiss a complaint for failure to state a claim." *Eternity Global*, 375 F.3d at 178. "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *W.W.W. Assocs., Inc. v. Giancotieri*, 565 N.Y.S.2d 440, 566 (1990)).

"A contract term is unambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Id.* at 294-95 (quoting *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012)).  The court is to "analyze the ambiguity of a provision under the normal rules of contract interpretation: words and phrases should be given their plain meaning and a contract should be construed so as to give full meaning and effect to all of its provisions." *Orchard Hill*, 830 F.3d at 157 (quoting *Orlander*, 802 F.3d at 295) (quotation marks omitted).  At bottom, "[a]n ambiguous term is one about which reasonable minds could differ." *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993).

Here, the interplay between sections (a) and (b) of Article 16.2 creates an ambiguity that cannot be resolved on a motion to dismiss.  As Plaintiffs argue, section (a) uses the mandatory terms "all" and "shall" to describe the employees that will be covered by the Health Fund 917 Medical Plan.  And as the Allied Defendants point out, section (b) uses more qualified language, defining the scope of Allied's obligation to make contributions for each of its employees "participating" in the Plan.  One reasonable way to read the sections together is to interpret section (b) as defining the scope of Allied's obligations rather than the scope of the employees covered by the Plan, which is defined entirely by section (a).  Another reasonable way to read the sections together is to interpret section (b) as both defining Allied's obligations *and* qualifying the scope of employees covered by the Plan.  Because both are reasonable, and because the Court lacks a sufficiently developed record to choose between those interpretations, it is ambiguous as a matter of law.

But even if the Allied Defendants were correct that section (b) unambiguously qualifies section (a), that would still leave another ambiguity: how to determine whether an employee was

in fact "participating" in the Plan. The Allied Defendants rest on one such method, wherein employees wanting to participate in the Plan needed to "return completed and signed 'Health Fund 917' enrollment documents and authorizations." (SMTD at 4.) Plaintiffs argue instead that "[i]f there is any consequential silence in the parties' agreement, it is the absence of any language permitting or suggesting that employee inaction was sufficient to opt-out of coverage or that an employee could opt-out without proof of alternative coverage. There is nothing in the CBA suggesting that Allied could decline to contribute to the Fund for employees who did not properly or affirmatively opt-out as required under the MOA." (Mem. Opp. at 8.) Much like the first ambiguity, nothing currently before the Court conclusively establishes that the Allied Defendants' interpretation is better than that of Plaintiffs.

Accordingly, the effect of Article 16.2 section (b) on the scope of employees for whom Allied was obligated to make Health Fund 917 Medical Plan contributions is ambiguous and therefore not a basis upon which to dismiss the First Amended Complaint.

  **B.** **Statute of Limitations**

The Allied Defendants' second basis for dismissing the First Amended Complaint is that the ERISA Section 515 claim is time-barred. "The parties agree that despite ERISA's pre-emption of most state laws regarding benefit plans, the most analogous state statute of limitations applies to all ERISA actions for delinquent contributions." (Mem. Opp. at 10.) But the Allied Defendants contend that "Plaintiffs had full knowledge in June 2017, or at the latest by July 12, 2017, of the alleged breach" but did not commence the action until August 16, 2023. (SMTD at 13; *see* Mem. Opp. at 10.) That just-over-six-year gap is significant here, since the parties agree that the "applicable limitations period for an ERISA delinquent contributions action ordinarily would be the six-year New York limitations period for breach of contract claims." (Mem. Opp. at 10.)

Plaintiffs' first response is that the statute of limitations governing their Section 515 claim was tolled for 228 days corresponding to the period between March 20, 2020, and November 3, 2020, during which then-Governor Cuomo issued a series of executive orders "tolling" statutes of limitations for claims arising under New York law.  More specifically, Plaintiffs contend that because ERISA does not contain its own statute of limitations but incorporates the most analogous state statute of limitations, the New York executive orders—beginning with Executive Order 202.8—should apply to this action, as well.  Though courts in this Circuit have not yet had the opportunity to consider Executive Order 202.8's effects on ERISA Section 515 claims, the Court holds that the orders effected a 228-day toll for such claims.

Because the parties agree that this action would ordinarily be governed by New York's six-year statute of limitations for breach-of-contract claims, the only disagreement concerns the effect of the 2020 executive orders.  Plaintiffs argue that the executive orders *tolled* the limitations period, thus extending the time to commence their action by 228 days.  The Allied Defendants argue instead that the executive orders merely *suspended* the limitations period, and thus that any claim that expired after November 3, 2020, was unaffected by the temporary measure.  Though neither the New York Court of Appeals nor the Second Circuit has decided the issue,[2] the Court is satisfied that Plaintiffs have the better interpretation.

---

[2] The Second Circuit has not ruled on whether Executive Order 202.8 had tolling or suspending effects.  In only one unpublished decision, *Makhnevich v. Novick Edelstein Pomerantz PC*, No. 23-202, 2024 WL 2207061 (2d Cir. May 16, 2024) (summary order), did the Second Circuit address the issue at all.  There, the panel mentioned in a footnote that while the plaintiff had made an argument for Executive Order 202.8 tolling in the district court, it had not raised the issue on appeal, and the Second Circuit would not consider it.  *Id.* at *2 n.5.

Most importantly, Plaintiffs' approach is the one taken by the New York intermediate appellate courts. *See, e.g.*, *Brash v. Richards*, 149 N.Y.S.3d 560, 584-85 (2d Dep't 2021) (holding that the executive orders functioned as a "toll" rather than as a suspension); *Baker v. 40 Wall St. Holdings Corp.*, 208 N.Y.S.3d 680, 681 (2d Dep't 2024) ("[D]ue to the tolling provision of the executive orders, the statute of limitations within which the plaintiff was required to commence this action was tolled between March 20, 2020, and November 3, 2020, a period of 228 days."). This Court is to follow decisions of the state intermediate appellate courts unless there is reason to believe that the state's highest court would take a different position on a matter of state law. *See V.S. v. Muhammad*, 595 F.3d 426, 432 (2d Cir. 2010); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 344 F.3d 211, 221 (2d Cir. 2003).

The Court is unpersuaded that the intermediate appellate courts have it wrong. Many federal district courts—though not all—have held that Executive Order 202.8 effected a tolling of relevant statutes of limitations, rather than a mere suspension. *See, e.g.*, *Powell v. United States*, No. 19-CV-11351, 2022 WL 1645545, at *2 (S.D.N.Y. 2022) (holding that Executive Order 202.8 created a "228-day toll" that "was sufficient to preserve Plaintiff's . . . false arrest claim, which was otherwise filed approximately 70 days late"); *U.S. Bank Nat'l Ass'n as Trustee to Bank of Am., N.A. v. Keybank, Nat'l Ass'n*, No. 20-CV-3577, 2023 WL 2745210, at *12 (S.D.N.Y. Mar. 31, 2023) ("Though there is some disagreement among courts as to whether the Executive Orders 'tolled' or 'suspended' statutes of limitations, this Court concludes that the Executive Orders tolled the New York statute of limitations on New York state law claims asserted in a federal court."); *Barnes v. Uzu*, No. 20-CV-5885, 2022 WL 784036, at *9-11 (S.D.N.Y. Mar. 15, 2022) (interpreting Executive Order 202.8 to have tolling, rather than

suspending, effect). That reading is buttressed by the text of the original order itself, which purports to "toll" statutes of limitations, rather than suspend them.[3]

Based on the decisions of the New York Appellate Division and other courts in this district, along with the plain text of Executive Order 202.8, the Court concludes that the orders effected a 228-day toll of the ERISA Section 515 claim. As Plaintiffs commenced this action on August 16, 2023—not more than six years and 228 days after "June 2017, or at the latest . . . July 12, 2017" (SMTD at 13)—the action is not barred by the statute of limitations. Because even the longest possible period between when Plaintiffs' claim accrued and when they commenced this action does not exceed the limitations period as tolled during 2020, the Court need not reach Plaintiffs' remaining arguments for timeliness.

### C. Liability of Allied Aviation

The Allied Defendants' third and final basis for dismissing the First Amended Complaint is that Plaintiffs have failed to plead a basis for Allied Aviation Services' liability, as the CBA and MOA purport to be between the Union and Allied New York. Plaintiffs respond that they have pleaded "sufficient facts" for the Court to conclude at this stage that "Allied Aviation Services, Inc. should be considered a single employer with and/or alter-ego of Defendant Allied New York Services, Inc. and therefore held liable for those delinquent contributions owed to the

---

[3] Defendants in other cases, though not here, have also argued that the orders extending the effects of Executive Order 202.8 did not use the word "toll." The Appellate Division in *Brash* is instructive on this point:
> [A]lthough the seven executive orders issued after Executive Order [202.8] did not use the word "toll," those executive orders . . . stated that the Governor "hereby continues the suspensions, *and modifications* of law . . ." made in the prior executive orders . . . . Since the tolling of a time limitation contained in a statute constitutes a modification of the requirements of such statute, . . . these subsequent executive orders continued the toll that was put in place by Executive Order [202.8].

149 N.Y.S.3d at 585 (brackets omitted and emphasis added).

10

Health Fund . . . ." (Mem. Opp. at 13.) As an initial matter, even if the Allied Defendants are correct on this point, Plaintiffs have also named Allied New York Services, Inc., as well as its employees, as defendants in this matter, and so this argument would not justify dismissing the First Amended Complaint entirely. Nevertheless, Plaintiffs are correct that they have plausibly alleged that the two entity defendants should be treated as one employer for the purposes of the claim at issue here.

"[A] collective bargaining agreement may be enforced against non-signatory employers if the employers constitute a 'single employer' and if the employees of the companies constitute a single appropriate bargaining unit." *Brown v. Sandimo Materials*, 250 F.3d 120, 128 n.2 (2d Cir. 2001) (citing *Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 747 (2d Cir. 1996) (per curiam)). "Separate companies are considered a single employer if they are part of a single integrated enterprise." *Lihli Fashions*, 80 F.3d at 747 (quotation marks omitted). The agreement may also be enforced against a nonsignatory entity that is an "alter ego" of a signatory. "The hallmarks of the alter ego doctrine include whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Id.* at 748 (quoting *Truck Drivers Loc. Union No. 807 v. Reg'l Import & Export Trucing Co., Inc.*, 944 F.2d 1037, 1046 (2d Cir. 1991)) (quotation marks omitted). Importantly, "determinations of both single employer and alter ego status are questions of fact." *Id.* at 747. As such, they are not well-suited to disposition at the motion to dismiss stage, where the Court must assume the truth of a plaintiff's factual allegations.

Determinations of single employer status turns on the "interrelation of operations, common management, centralized control of labor relations and common ownership" of the signatory and nonsignatory entities. *Radio & Television Broadcast Technicians Loc. Union 1264*

11

*v. Broadcast Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965) (per curiam). "Also relevant are the use of common office facilities and equipment and family connections between or among the various enterprises." *Lihli Fashions*, 80 F.3d at 747. Every factor need not be present; the most important consideration is the "absence of an arm's length relationship found among unintegrated companies." *Id.* (quoting *NLRB v. Al Bryant*, 711 F.2d 543, 551 (3d Cir. 1983) (quotation marks omitted)).

      Plaintiffs allege that Allied Aviation and Allied New York have the same President, Robert L. Rose, the same Treasurer, Alice Nichols, and the same Director of HR, Payroll and Benefits, Daniel LaBorde. (FAC ¶ 11.) From the face of the First Amended Complaint, Plaintiffs do not allege that Allied Aviation and Allied New York share office space, as paragraphs nine and ten allege different addresses for each of the entity defendants. However, Plaintiffs do repeatedly allege that Allied Aviation is "the JFK office of Allied New York." (FAC ¶¶ 32, 33.) Moreover, Plaintiffs allege that LaBorde, acting as Director of HR, Payroll & Benefits "of Allied Aviation and, on information and belief, Allied New York," corresponded with the Fund's auditors "stating Allied Aviation's disagreement with" the Audit's findings. (FAC ¶ 35.) And Plaintiffs also allege that Allied Aviation was involved in negotiating the contested meaning of the MOA with Union representatives, including providing employees with notice of Allied Aviation's interpretation that section (b) required employees to indicate their participation in the Plan before Allied would be obligated to make contributions. (*See* FAC ¶¶ 36-53.) Those facts, taken to be true at this stage, are sufficient to establish that Allied Aviation and Allied New York operated as a single employer for the purposes of this dispute. Plaintiffs have alleged an interrelation of operations, common (if not identical) management, and centralized control of labor relations. Though Plaintiffs have not made allegations concerning

12

the ownership of Allied Aviation and Allied New York, not every single-employer factor need be present. Most simply, Plaintiffs allege that Allied Aviation and Allied New York acted as a single entity when negotiating the interpretation and operation of the disputed MOA.

Defendants do not contest any of these allegations in their motion to dismiss, arguing only that "a cursory review of the preamble to the MOA evidences that the MOA specifically identifies the parties to both the CBA and MOA to be the Union and Allied New York Services, Inc., not defendant Allied Aviation Services Inc." (SMTD at 15.) But as has already been discussed, a defendant employer need not be a named signatory to an agreement for Section 515 liability to attach, so long as the defendant is a single employer with or alter ego of the signatory employer. Because the Court concludes that Plaintiffs have plausibly alleged that Allied Aviation and Allied New York constitute a single employer, Allied Aviation's status as a nonsignatory is not a basis upon which to dismiss the First Amended Complaint with respect to that defendant.

### IV. Conclusion

For the foregoing reasons, the Allied Defendants' motion to dismiss the First Amended Complaint is DENIED. Defendants shall file an answer within 14 days after the date of this opinion and order. *See* Fed. R. Civ. P. 12(a)(4)(A).

The Clerk of Court is directed to close the motion at Docket Number 25.

SO ORDERED.

Dated: August 13, 2024
      New York, New York

_____
J. PAUL OETKEN
United States District Judge